■ In the Matter of NORTH MANURSING WILDLIFE SANCTUARY, INC., Respondent, CITY OF RYE et al., Appellants.—In a proceeding, *inter alia,* to review the tax assessments levied by the City of Rye upon the real property of the petitioner, the appeal is from a judgment of the Supreme Court, Westchester County, entered August 5, 1977 which, *inter alia,* determined that petitioner's property is exempt from taxation as provided in section 421 of the Real Property Tax Law. Judgment reversed, on the law, without costs or disbursements, and proceeding dismissed on the merits. In 1966 petitioner, a not-for-profit corporation, acquired six and one-half acres of property located in the City of Rye on North Manursing Island. The property consisted of more than three acres of upland and about three acres of land under water. In 1967 the petitioner was declared tax exempt under former section 420 of the Real Property Tax Law (now section 421 as amended). Petitioner was created in 1966 by residents of North Manursing Island. The island they inhabit contains some 35 individual residences. There were consultations with conservation experts as how to best use the land owned by the petitioner. It was determined that the land was suitable for a wildlife sanctuary. The initial cost of spraying and planting shrubs was approximately $1,000. Thereafter, during a 10-year period, the area was

sprayed three times, each a one-day operation. Also, the sanctuary grounds were mowed at least once a year. The cost of maintaining the property appears to be minimal. The petitioner's president, while soliciting contributions to purchase the property, had informed his neighbors that the purpose for acquiring the property was "intended to be for the benefit of the Island families as a group." Were it not for the intervening amendments to section 421 (subd 1, par [b]) of the Real Property Tax Law, the property may have continued to enjoy its tax exempt status assuming no drastic changes in the manner of its use in the interim. However, as the Court of Appeals noted in *Matter of Swedenborg Foundation v Lewisohn* (40 NY2d 87, 92-93): "In 1971 the Legislature recast the statutory scheme of exemption from real property taxation by creating two classifications. Unqualified exemption was accorded corporations and associations 'organized or conducted exclusively for religious, charitable, hospital, educational, [moral or mental improvement of men, women or children] or cemetery purposes, or for two or more such purposes' (Real Property Tax Law, § 421, subd 1, par [a]). Qualified exemption was granted corporations and associations which did not fall within the first category, but which were organized or conducted exclusively for one or more of 14 other specified public benefit purposes (§ 421, subd 1, par [b]) (cf. *Matter of American Bible Soc. v Lewisohn,* 40 NY2d 78, decided herewith). The qualified exemption can be withdrawn by appropriate action of the governing board of the local municipal corporation within which the particular real property is located (§ 421, subd 1, par [b]). By Local Law No. 46 of 1971, the City of New York exercised its authority of withdrawal with respect to all qualified exemptions to the full extent." On April 23, 1975 the appellant municipality enacted legislation which resulted in the petitioner's property being restored to the tax roll. The property appears to be used primarily—if not exclusively—for bird-watching with minimal direct educational activities. There is no access by the public onto the property. Although there are no fences around any portion of the property, neither are there any signs marking the sanctuary. Significantly, a gate leading to the property is closed on weekends when presumably the public would be more likely to be seeking access to the sanctuary. There are no trails or paths; any roads that exist are private. Indeed, one could properly characterize the purported educational purposes served as "token". Whatever doubts may have previously existed concerning the petitioner's status have been resolved by the amendment to section 421 of the Real Property Tax Law and two opinions of the Court of Appeals, both rendered on June 10, 1976. In *Matter of American Bible Soc. v Lewisohn* (40 NY2d 78) the Court of Appeals, in commenting upon the gist of the legislation, stated that there were now two classes of exemptions: "qualified" or "unqualified". The court held that withdrawing qualified tax exempt status does not violate due process or equal protection since there is a rational basis for the legislation with no irrational or impermissible vague classifications being drawn. In *Matter of Swedenborg Foundation v Lewisohn (supra,* p 95), it was held that enjoyment of tax exempt status by virtue of a ruling by the United States Treasury Department is irrelevant for purposes of local real property tax assessment: "Nor does the fact that the foundation has received favorable determinations from the United States Department of the Treasury as to its exempt status for other tax purposes affect the outcome *(Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 154, *supra*)." In *People ex rel. German Masonic Temple Assn. of City of N. Y. v Goldfogle* (136 Misc 100, affd 229 App Div 863, affd 255 NY 586), the rules of construction pertaining to exemptions were set forth as follows (pp 103-104): "Statutes

exempting property from general taxation must be strictly construed against the property holder, and if exemption is not plainly expressed it may not be presumed. *(People ex rel. Y. M. A. v. Sayles* [32 App Div 197], *supra; People ex rel. D. K. E. Soc. v. Lawlor,* 74 App. Div. 533.) 'Exemptions from taxation are not favored and are to be strictly construed. They will not be sustained unless such clearly appears to have been the intent of the Legislature. An exemption from taxation must be expressed in clear and unambiguous language and appear to be indisputably within the intention of the Legislature.' *(People ex rel. Andrews v. Cameron,* 140 App. Div. 76, 80; affd. 200 N. Y. 585.)" See, also, *People v Brooklyn Garden Apts.,* (283 NY 373, 380); *Matter of F. O. R. Holding Co. v Board of Assessors of Town of Clarkstown* (45 AD2d 875). We do not find that the petitioner has met this burden of proof. Mollen, P. J., Shapiro and Hawkins, JJ., concur; Titone, J., dissents and votes to affirm the judgment with the following memorandum, in which Hopkins, J., concurs: At the trial of this action, uncontradicted testimony was adduced that the petitioner organization was initially formed by a group of about 25 people living in the appellant City of Rye, acting upon the advice of a conservationist who regarded the area as suitable for a wildlife sanctuary. Twenty-two of the group resided in the immediate area of North Manursing Island. The property on the island where the sanctuary is located includes about three acres of underwater land and similar acreage of upland. It is used solely as a sanctuary for water fowl, songbirds, ducks, raccoons, possum, etc. Specialized plants and shrubs have been brought to attract birds since there are many bird-watchers in and around the City of Rye. There is no fencing around the sanctuary to exclude the general public and a part-time guard is instructed to help visitors in every way possible. In sum, the members of the petitioner organization have expended time, effort and funds to promote what has been public policy in this State for innumerable years and has been codified in the Environmental Conservation Law, namely the preservation and protection of wildlife and the environment from which it emanates. The legislative manifestation of such public policy is simply but eloquently enunciated in the following provisions of ECL 1-0101: "Declaration of Policy. 1. The quality of our environment is fundamental to our concern for the quality of life. * * * 2. It shall further be the policy of the state to improve and coordinate the environmental plans, functions, powers and programs of the state, in cooperation with the federal government, regions, local governments, other public and *private organizations and the concerned individual,* and to develop and manage the basic resources of water, land and air to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations. 3. It shall further be the policy of the state to foster, promote, create and maintain conditions under which man and nature can thrive in harmony with each other" (emphasis supplied). Consistent with the above provisions is the following language contained in the more recently enacted Environmental Quality Review Act (ECL 8-0101): "It is the purpose of this act to declare a state policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state." The Legislature expressed a concern for the quality of life, an awareness of the shrinking available space in congested areas, and the intention to do something to preserve and enhance the ecological system. It specifically declared its intent that all agencies conduct their affairs with an

awareness "that they are stewards of the air, water * * * and *living resources,* and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations" (ECL 8-0103, subd 8 [emphasis supplied]). It should also be observed that the legislative findings leading to the enactment of the Tidal Wetlands Act in 1973 (ECL art 25) contains the following pertinent language (L 1973, ch 790, § 1): "tidal wetlands constitute one of the most vital and productive areas of our natural world, and * * * their protection and preservation are essential. [Upon listing the values of such wetlands, the Legislature included] (b) wildlife habitat—tidal wetlands are necessary as the breeding, nesting and feeding grounds and as cover to escape predators for many forms of wildlife, waterfowl and shorebirds." In subdivisions (d) and (g) of such findings is found the following: "(d) recreation—tidal wetlands provide hundreds of square miles and millions of days of recreation, hunting, fishing, * * * bird watching, photography * * *; the location of many tidal wetlands fronting on the eastward expansion of human population in Long Island makes them the 'last frontier' for certain of the state's valuable natural resources, underscoring the necessity for their preservation in parks and reserves; * * * (g) education and research—tidal wetlands afford a wide range of opportunity for scientific research, outdoor biophysical laboratories, and *living educational classrooms;* their training and educational value is enormous, and they offer unbounded opportunity for the imparting of environmental values in our youth" (emphasis supplied).* Clearly, therefore, the petitioner's endeavors in operating and maintaining its real property as a wildlife sanctuary is in accord with the public policy of this State which considers facilities of that nature as educational and for the moral and mental improvement of men and women. That it also benefits many of the nearby residents who are also members of the petitioner organization in no way detracts from the fact that the subject real property was "organized", and is *"conducted exclusively for * * * educational, moral or mental improvement of men, women or children"* (Real Property Tax Law, § 421, subd 1, par [a]; emphasis supplied). It should also be noted that in prior litigation between these parties *(Matter of North Manursing Wildlife Sanctuary v City of Rye,* 52 Misc 2d 96, revd on other grounds, 28 AD2d 891, as amd 28 AD2d 960), the late Justice Dillon, in 1966, made the following pertinent observation (p 97): "But it is apparent that section 420 [now section 421 as amended] of the Real Property Tax Law is not limited to that narrow area. It also grants exempt status to organizations devoted to 'the *moral or mental improvement of men and women'.* An organization which has as one of its purposes 'to provide a feeding, breeding, nesting and refuge ground for birds and fowl' and which has the further purpose to 'educate and instruct the citizenry in the field of conservation' is devoted to human betterment and is therefore entitled to tax exempt status under section 420 [now section 421 as amended] of the Real Property Tax Law." (Emphasis supplied.)* The

---

* In reversing Justice Dillon's ultimate determination, this court did not take exception to the above-quoted statement. However, it remitted the matter for a hearing to determine whether the property involved was to be used as a wildlife sanctuary in furtherance of petitioner's certificate of incorporation. After the hearing on remittitur, Justice Dillon, on November 2, 1967, held the subject premises to be a bona fide wildlife sanctuary and that therefore the premises were exempt from taxation under the then section 420 of the Real Property Tax Law. An order pursuant to such determination, from which no appeal was ever taken, was entered November 27, 1967.

underlined language used by Justice Dillon, to wit, "moral or mental improvement of men and women", was essentially incorporated into both paragraphs (a) and (b) of subdivision 1 of section 421 of the Real Property Tax Law, as amended (L 1972, ch 529, § 1). Thus petitioner's sanctuary clearly comes within the public policy of the State as now codified. Lastly, the purpose for which the petitioner was formed and its operations thereunder, qualify it for a tax exemption under section 421 (subd 1, par [a]) of the Real Property Tax Law, as amended. Except for a few hours on Saturdays and Sundays, when it is closed, the sanctuary may be, and is, freely used by those of the general public who are interested in bird-watching and/or observing other wildlife in their natural environment. Since its inception, it has been used exclusively as a wildlife sanctuary for the general public. There are several vantage points from which varieties of wildlife can be viewed. The sanctuary is available to school teachers and children, to adults interested in ornothology and ecology and to those who appreciate the beauty and diversity of a natural environment. Finally, it is also accessible to those who have a profound reverence for all living creatures and derive spiritual solace from the wonders of life. As beautifully and poignantly expressed by Samuel Coleridge in the "Rime of the Ancient Mariner": "He prayeth well, who loveth well. Both man and bird and beast. He prayeth best, who loveth best All things both great and small; For the dear God who loveth us He made and loveth all." In my opinion, the purposeful and continued interest of the members of petitioner's organization in preserving and maintaining the sanctuary, and the judicial determination of tax exemption during the more than 10 years of its existence should not be destroyed. The City of Rye has acquired a public benefit at a cost that cannot and should not be measured in dollars and cents. Simple logic dictates that petitioner should be encouraged by the city to preserve the property in its present state for future generations.

